IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO

LEAGUE OF UNITED LATIN AMERICAN
CITIZENS; LEAGUE OF UNITED LATIN
AMERICAN CITIZENS OF TEXAS;
JOSEPH C. PARKER, Jr.; HECTOR
FLORES; SANFORD LEVINSON; YVONNE
M. DAVIS; MARY RAMOS; GLORIA RAY;
GUADALUPE TORRES; RAY VELARDE;
and DORIS WILLIAMS,

              Plaintiffs,

    v.

Case No. "3:18-cv-00175

GREGORY WAYNE ABBOTT, in his official
capacity as Governor of the State of Texas; and
ROLANDO PABLOS, in his official capacity
as Secretary of State of the State of Texas,

              Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### NATURE OF THE ACTION

1.    The predominant method in America for counting votes in presidential elections

violates the United States Constitution; it also distorts presidential campaigns, facilitates targeted

outside interference in our elections, discriminates against racial and other minority voters, and

ensures that a substantial number of citizen voters are disenfranchised when their votes are tallied in early November, only to be discarded when it really counts in mid-December.

2.      The Constitution assigns to presidential "Electors" the vote to choose the President and Vice President.  U.S. Const. art. II, § 1.  States determine how those Electors are selected.  Texas, like 47 other states and the District of Columbia, has decided to select Electors on a winner take-all ("WTA") basis, whereby the political party of the leading candidate among Texas voters selects every Elector, with the vote of every other Texas citizen rendered meaningless by receiving no Elector directly or through a political party.  In 2016, for example, President Donald Trump received 52.2% of the vote in Texas, yet he received every single electoral vote from Texas.  Likewise, Secretary Hillary Clinton received 43.2% of the vote in Texas, but received none of the electoral votes from Texas.

3.      This magnification of certain votes and cancellation of all others is required by Texas law.  Under Texas's WTA method of selecting Electors, the party of the presidential candidate who wins more votes than any other candidate in the state is awarded all of Texas's 38 Electors.  *See* Tex. Elec. Code § 192.005 ("The set of elector candidates that is elected is the one that corresponds to the candidates for president and vice-president receiving the most votes."); *see also* National Archives and Records Administration, *Frequently Asked Questions*, https://www.archives.gov/federal-register/electoral-college/faq.html#wtapv (last visited Feb. 15, 2018) ("The District of Columbia and 48 states have a winner-takes-all rule for the Electoral College.  In these States, whichever candidate receives a majority of the popular vote, or a plurality of the popular vote (less than 50 percent but more than any other candidate), takes all the state's Electoral votes.").

4.     The WTA method gives one candidate's party all of the Electors, regardless of whether the winning candidate has garnered only 40.5% of the popular vote in Texas, as George H.W. Bush did in 1992, or as much as 88%, as Franklin D. Roosevelt did in 1932.  Either way, the vote of each and every citizen voter is cancelled when the final direct election for President takes place unless it is cast for the winning candidate.  This includes as many as 3,877,868 Texas citizens who voted for Hillary Clinton in 2016.

5.     In Texas, it is Democrats, and Hispanic and African-American voters, who are effectively disenfranchised by the WTA system of selecting Electors.  In each of the last ten presidential elections, the preferred candidate for Hispanic or African-American voters received no Electoral votes, with the Electoral votes going solely to Republican candidates.  In those ten presidential elections, 26,905,744 votes were cast for the Democratic candidate in Texas, but none of the 324 Texas Electors was awarded to the Democratic candidate.

6.     This problem is not unique to Texas; it is also not unique to Democrats, as the same phenomenon occurs in reverse in heavily Democratic states where votes for the Republican candidate for President are systemically discarded before the final direct election for President.

7.     Thus, under the WTA system, many Texans have been and will continue to be denied their constitutional right to an equal vote in the presidential election.

8.     The WTA system also perpetuates racial discrimination in voting and the dilution of minority voting power in violation of the Voting Rights Act of 1965, as amended in 1982 (the "Voting Rights Act").

9.     The WTA system also weakens the influence of Texas in presidential campaigns generally.  In particular, WTA leads presidential campaigns to focus on "battleground" states that in 2016 together represented only 35% of voters and did not include Texas.  George Pilsbury

& Julian Johannesen, Nonprofit VOTE, *America Goes to the Polls 2016: A Report on Voter Turnout in the 2016 Election*, at 12 (Mar. 16, 2017), *available at* http://www.nonprofitvote.org/documents/2017/03/america-goes-to-the-polls-2016.pdf/. Accordingly, presidential campaigns largely do not focus on the citizens of Texas, despite the fact that Texas has the second highest number of Electors in the United States. In fact, just four battleground states—Florida, North Carolina, Ohio and Pennsylvania—saw 71% of total nationwide campaign advertising spending and 57% of candidate appearances; the top fourteen battleground states[1] saw 99% of advertising spending and 95% of candidate appearances. *Id.* at 7, 12. It is, therefore, no surprise that Texas ranks in the top five states for lowest voter turn-out during presidential elections. *Id.* at 10. WTA causes candidates for President and Vice President to give disproportionate attention to an unrepresentative subset of the country, ultimately giving that unrepresentative subset outsized political influence. Under such circumstances, the presidential election does not reflect or include the voices of the entire nation, including individuals in Texas.

10.     Finally, the WTA system distorts presidential campaigns and facilitates outside interference in our elections. In close elections, WTA makes it much easier and much more likely for a very small number of voters in a few predictable battleground states to determine the final electoral result than would be the case with a system of proportional selection of Electors. This increased vulnerability gives the Court added reason to ensure that the current system satisfies the requirements of the Constitution.

11.     This lawsuit is a challenge to the WTA method selected by Texas. As established by longstanding Supreme Court precedent, that exercise of state discretion remains subject to

---

[1] The fourteen battleground states in the 2016 presidential election were assumed to be Arizona, Colorado, Florida, Georgia, Iowa, Maine, Michigan, Nevada, New Hampshire, North Carolina, Ohio, Pennsylvania, Virginia, and Wisconsin.

Constitutional norms, including the First and Fourteenth Amendments, as well as Section 2 of the Voting Rights Act.

12.    To be clear, this lawsuit is not a challenge to the Electoral College, which is mandated by the Constitution. Instead, it is a challenge to the decision of Texas to award and select Electors on a WTA basis. The Constitution does not address how states should select Electors, and it certainly does not require WTA. To the contrary, as shown below, WTA is inimical to the long-established principle of "one person, one vote," and thereby violates the fundamental constitutional right to vote, as well as other constitutional and statutory rights.

13.    Plaintiffs seek (1) a declaratory judgment that the WTA provisions of Texas's election code, *see* Tex. Elec. Code § 192.005, violate the First and Fourteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act; and (2) an order permanently enjoining the use of the WTA method (or other non-representational methods, such as selection by Congressional District vote) of selecting Electors in presidential elections.

14.    WTA violates the Fourteenth Amendment because it counts votes for a losing presidential candidate in Texas only to discard them in determining Electors who cast votes directly for the presidency. Put differently, the WTA system unconstitutionally magnifies the votes of a bare plurality of voters by translating those votes into an entire slate of presidential Electors, all of whom support the nominee of a single political party—while, at the same time, the votes cast for all other candidates are given no effect. Accordingly, in the last five presidential elections, at least 37.98% of Texas voters cast a vote for the candidate that did not win the popular vote in Texas, and those voters thereby effectively had their votes cancelled. Their votes were completely irrelevant to how the Electors representing Texas voted in the

Electoral College.  WTA thus treats Texas citizens who vote for a losing candidate in an arbitrary and disparate manner in clear violation of the principle of "one person, one vote."

15.    In addition, WTA violates the First Amendment because of the burdens that it places on the right of association and on the right to have a voice in presidential elections through casting a vote.  There is no state interest that remotely outweighs these burdens.  Again, at least 37% of voters in the last five presidential elections—nationwide and in Texas—have voted for a losing candidate, and none of their votes has counted in the final direct election.  This trend will likely continue.

16.    The WTA system of selecting Electors also violates Section 2 of the Voting Rights Act.  Texas has a long and well-documented history of discrimination against Hispanics and African Americans in voting, voter registration, and other forms of participation in the political process.  That history has included the use of at-large voting districts to dilute or eliminate the voting power of Hispanics and African Americans.  It has also manifested itself in significant racial disparities in education, employment, health, housing, income, transportation, and incarceration.

17.    The WTA system of selecting Electors is consistent with that history and works in the same way as an at-large voting district.  Despite the fact that Texas has 38 Electors and Hispanic and African-American voters represent over 40% of the Citizen Voting Age Population ("CVAP") of the state, the WTA system allows white voters to usually—if not always—defeat all Electors slated for Hispanic and African-American preferred candidates.  Indeed, Hispanic and African-American voters in Texas have not had a single Elector slated for their preferred candidate in the last four decades.

18.     Under alternative, more democratic systems of selecting Electors, Hispanic and African-American voters in Texas are sufficiently numerous, geographically compact, and politically cohesive to have Electors for their preferred candidate in *each* presidential election.

19.     Continuation of the WTA system will ensure that the vast majority of votes from Hispanic and African-American voters for the President of the United States will remain meaningless in Texas. This, in turn, will continue to dampen incentives for Hispanics and African Americans in Texas to participate in the presidential political process and will diminish presidential candidates' incentives to campaign for the votes of Hispanic and African-American citizens of Texas.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction based upon 28 U.S.C. § 1343(a)(3) & (4) and 28 U.S.C. § 1331 for causes of action arising from 52 U.S.C. § 10301, *et seq.* Subject matter jurisdiction for Plaintiffs' claims under the First and Fourteenth Amendments to the United States Constitution exists under 42 U.S.C. § 1983 and 28 U.S.C. § 1331.

21.     Venue is proper in this Court under 28 U.S.C. § 1391(b).

## PARTIES

22.     Because of Texas's WTA method of selecting Electors, each of the individual Plaintiffs listed below ("Individual Plaintiffs") has suffered, and will again suffer, an injury that comes from lacking any meaningful representation in the final vote count for the President (and Vice President) of the United States. In particular, because the Individual Plaintiffs have voted for, and will vote for, the Democratic or third-party candidate for President in Texas, they have been, and will be again, deprived of the right to have their votes counted equally and meaningfully toward the election of the President.

7

23.     Plaintiff League of United Latin American Citizens ("LULAC") is the oldest and largest national Latino civil rights organization.  LULAC is a nonprofit organization, incorporated under the laws of the State of Texas, with presence in most of the fifty states and Puerto Rico.  LULAC has chapters in most Texas counties and has individual members who reside and vote throughout Texas, including members who have voted and will vote for the Democratic, or third party, presidential candidate in Texas elections for the President.  LULAC has long been active in representing Latinos and other minority interests in all regions of the State.  LULAC conducts voter registration activities throughout Texas, and exercises its rights under the Constitution to engage in full and effective political participation for Latinos and minority voters.  Since 1971, LULAC has filed well over a hundred lawsuits on behalf of Latino voters throughout Texas, and has been successful in many of them.

24.     Plaintiff League of United Latin American Citizens of Texas ("LULAC of Texas") is a nonprofit organization with members located in many cities and towns throughout the State of Texas.  LULAC of Texas has individual members who reside and vote throughout Texas, including members who have voted and will vote for the Democratic, or third party, presidential candidate in Texas elections for the President.  Since its founding, LULAC of Texas has fought for full access to the political process, increased political power, and improved political opportunities for Hispanic Americans in Texas.

25.     Plaintiff Rev. Joseph C. Parker, Jr. lives in Austin, Texas where he has been registered to vote for over three decades.  He is an African-American attorney and pastor, and votes in the Texas Democratic primaries for the President.  Rev. Parker has voted for the Democratic candidate in every presidential election since he was eligible to vote.  He plans to

remain a permanent resident of Austin, Texas, where he will continue to vote in future presidential elections for the Democratic candidate.

26.     Plaintiff Hector Flores is the former president of LULAC and lives in Duncanville, Texas, where he is registered to vote.  He is a Hispanic American and has voted for the Democratic presidential candidate in every presidential election since 1960.  He plans to remain a permanent resident of Duncanville, Texas, where he will continue to vote in future presidential elections for the Democratic candidate.

27.     Plaintiff Sanford Levinson lives in Austin, Texas, where he is a professor of constitutional law and is registered to vote as a Democrat.  He has voted for the Democratic presidential candidate in every presidential election in which he has been eligible to vote.  He plans to remain a permanent resident of Austin, Texas, where he will vote in future presidential elections for the Democratic candidate.

28.     Plaintiff Yvonne Massey Davis lives in Austin, Texas, where she is registered to vote as a Democrat.  She is African American and has consistently voted for the Democratic presidential candidate in Texas presidential elections.  She plans to remain a permanent resident of Austin, Texas, where she will continue to vote in future presidential elections for the Democratic candidate.

29.     Plaintiff Mary Ramos lives in Houston, Texas, where she is registered to vote.  She is a Hispanic American and has voted for the Democratic presidential candidate in every presidential election since at least 2004.  She plans to remain a permanent resident of Houston, Texas, where she will continue to vote in future presidential elections for the Democratic candidate.

30.     Plaintiff Gloria Ray lives in San Antonio, Texas, where she has been registered to vote for several decades.  She is African American, and she has voted in the Texas Democratic primaries for the President.  Ms. Ray has voted for the Democratic candidate in every presidential election since she was eligible to vote.  She plans to remain a permanent resident of San Antonio, Texas, where she will continue to vote in future presidential elections for the Democratic candidate.

31.     Plaintiff Guadalupe Torres lives in San Antonio, Texas, where she is registered to vote.  She is a Hispanic American and has voted for the Democratic presidential candidate in every presidential election in which she has been able to vote.  She plans to remain a permanent resident of San Antonio, Texas, where she will continue to vote in future presidential elections for the Democratic candidate.

32.     Plaintiff Raymundo ("Ray") Velarde lives in El Paso, Texas, where he is registered to vote.  He is a Hispanic American and has voted consistently for the Democratic presidential candidate; he has never voted for the Republican presidential candidate.  He plans to remain a permanent resident of El Paso, Texas, where he will continue to vote in future presidential elections for the Democratic candidate.

33.     Plaintiff Doris Williams lives in Pflugerville, Texas, where she is registered to vote.  She is African American and has voted for the Democratic presidential candidate in every presidential election in which she has been eligible to vote.  She plans to remain a permanent resident of Austin, Texas, where she will continue to vote in future presidential elections for the Democratic candidate.

34.     Defendant Gregory Wayne Abbott is the Governor of Texas and is sued in his official capacity for declaratory and prospective injunctive relief to prevent a violation of federal

constitutional rights.  Governor Abbott is the chief executive in the State of Texas and must "communicate" to the "Archivist of the United States a certificate of such ascertainment of the electors appointed, setting forth the names of such electors and the canvass or other ascertainment under the laws of such State of the number of votes given or cast for each person for whose appointment any and all votes have been given or cast". 3 U.S.C. § 6.  In these circumstances, Governor Abbott has no immunity from suit.

36. Defendant Rolando Pablos is the Secretary of State of Texas and is sued in his official capacity for declaratory and prospective injunctive relief to prevent a violation of federal constitutional rights.  Mr. Pablos is the chief elections officer in the State of Texas and must "prepare a certificate of election for each presidential elector candidate who is elected."  Tex. Elec. Code § 67.016(d).  In these circumstances, Mr. Pablos has no immunity from suit.

## WTA IS NOT MANDATED BY THE CONSTITUTION

36. Under Article II, Section 1 of the U.S. Constitution, states are given authority to determine the manner of selecting Electors.  That provision of the Constitution states: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" to choose a President and Vice President.

37. "When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush v. Gore*, 531 U.S. 98, 104 (2000).

38. The Constitution grants "extensive power to the States to pass laws regulating the selection of electors.  But the Constitution is filled with provisions that grant Congress or the States specific power to legislate in certain areas; these granted powers are always subject to the

limitation that they may not be exercised in a way that violates other specific provisions of the Constitution." *Williams v. Rhodes*, 393 U.S. 23, 29 (1968).

39.      Texas has chosen the WTA system of selecting Electors for presidential races. Neither Article II, Section 1 of the U.S. Constitution, nor any other constitutional provision, compels Texas to make that choice.

## TEXAS'S METHOD OF SELECTING ELECTORS IS UNCONSTITUTIONAL

40.      Texas's WTA method of selecting Electors violates the Fourteenth Amendment's command that no State may "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  It also violates the First Amendment by unduly burdening the rights of the citizens of Texas to associate and to effectively express their political preferences through voting. *See* U.S. Const. amend. I, § 1

41.      Under Article II, Section 1 of the United States Constitution, each state is required to appoint the same number of Electors as it has Senators and Representatives.  U.S. Const. art. II, § 1.  These Electors are tasked with electing the President and Vice President of the United States.  *Id.*

42.      While Article II, Section 1 grants the states "extensive power" to "pass laws regulating the selection of electors," it cannot be "thought that the power to select electors could be exercised in such a way as to violate express constitutional commands that specifically bar States from passing certain kinds of laws." *Rhodes*, 393 U.S. at 29.  The Supreme Court has made clear "that no State can pass a law regulating elections that violates the Fourteenth Amendment's command that No State shall deny to any person the equal protection of the laws." *Id.* (internal quotation marks and ellipses omitted).  "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good

citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right." *Wesberry v. Sanders*, 376 U.S. 1, 17–18 (1964).

43.     In Texas, as in the rest of the country, citizens do not vote directly for President. Instead, they vote for Electors, who then cast their votes in a direct election for President. Texas has chosen to adopt a WTA system for determining Electors. Under this system, all of Texas's 38 Electors are members of the political party that nominated the candidate that wins the popular vote in the state. The consequence of this system is to give no effect to the votes of citizens who voted for a losing candidate in Texas in the tabulation of the final vote for President. Texas's WTA system violates the "one person, one vote" principle, long enshrined in Fourteenth Amendment Supreme Court jurisprudence, because votes for a losing presidential candidate are counted in Texas only to be discarded when another candidate wins more votes in Texas. In other words, if an individual does not vote for the winning candidate in Texas, that person's vote translates into no representation in the state's multi-member Electoral College delegation.

**A.     The WTA Method of Determining Electors Violates the "One Person, One Vote" Principle and the Fourteenth Amendment.**

44.     In 2016, 43.2% of voters in Texas voted for the Democratic candidate for President. Despite this significant bloc of support, every single Democratic vote was systemically discarded under the WTA method of selecting Electors.

45.     Such systemic discarding of votes occurs in election after election in Texas. In the last five presidential elections, the Democratic candidate for President received at least 37% of the vote—43.23% in 2016 (3,877,868 votes), 41.38% in 2012 (3,308,124 votes), 43.68% in 2008 (3,528,633 votes), 38.22% in 2004 (2,832,704 votes), and 37.98% in 2000 (2,433,746 votes). In each of these elections, the entirety of Texas's Electors went to Republican

13

candidates, cancelling the votes of Democratic voters.  Combined, Texas has discarded nearly 16 million presidential votes since the year 2000.  During the same period, Republican candidates received roughly 22 million popular votes, but those votes were unduly magnified in each election and translated into the election of 176 total Electors, and 176 total electoral votes cast for Republican presidential nominees.  During the same period, Texas selected zero Democratic Electors.

46.     A similar pattern holds over the last ten presidential elections.  In the presidential elections from 1980-1996, the Democratic candidate received between 36% and 44% of the vote, but the state selected zero Democratic Electors.  In the aggregate, from 1980 to 1996, over 11 million Democratic votes in Texas were systemically discarded.

47.     The inequitable nature of the current system of determining Electors has been recognized by both major parties.  As Saul Anuzis, the former Chairman of the Michigan Republican Party, stated, "This is, to me, a nonpartisan issue.  It's a question of what is the right way to elect a president.  In every other office in the land, we elect the person who gets the most votes, from dog catcher to governor."  Eliza Newlin Carney, *GOP Nonprofit Backs Electoral College*, Roll Call (Dec. 7, 2011, 12:57 PM), http://www.rollcall.com/news/GOP-Nonprofit-Backs-Electoral-College-210872-1.html.

48.     Democrats also share this view.  For example, Representative James Clyburn, when writing on the WTA system of selecting Electors, stated, "My position has always been that winner-take-all elections trample on the variety of voices in our diverse country.  Winner-take-all elections by their very nature mean that the highest vote getter wins, even if the margin of victory is only one vote."  James Clyburn, *Representative James Clyburn: Mend It*, The American Prospect (Dec. 19, 2001), http://prospect.org/article/flunking-electoral-college.

14

Similarly, retired Senate Minority Leader Harry Reid called the Electoral College "very undemocratic." Chris Sanchez, *'UNDEMOCRATIC': Harry Reid goes in on the Electoral College*, Business Insider (Dec. 13, 2016, 10:54 PM), http://www.businessinsider.com/electoral-college-undemocratic-harry-reid-trump-hillary-clinton-2016-12.

49.     The "one person, one vote" principle means that Texas may not "value one person's vote over that of another." *Bush*, 531 U.S. at 104–05.  The Supreme Court laid the groundwork for the "one person, one vote" principle over fifty years ago in *Baker v. Carr*, 369 U.S. 186 (1962), in which it recognized a right to vote "free of arbitrary impairment by state action" whether "such impairment resulted from dilution by a false tally, or by a refusal to count votes from arbitrarily selected precincts, or by a stuffing of the ballot box." *Id.* at 208 (internal citations omitted).

50.     "One person, one vote" was first articulated the following year in *Gray v. Sanders*, 372 U.S. 368 (1963), which involved a challenge to Georgia's system for allocating votes in the primary for statewide office.  The Court invalidated Georgia's system because the candidate winning the popular vote in the county under that system would receive "the entire unit vote of that county," with "other votes for a different candidate being worth nothing and *being counted only for the purpose of being discarded*." *Gray*, 372 U.S. at 381 n.12 (emphasis added).  In so holding, the Court stressed: "The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote." *Id.* at 381.

51.     "Over the ensuing decades, the Court has several times elaborated on the scope of the one-person, one-vote rule." *Evenwel v. Abbott*, 136 S. Ct. 1120, 1124 (2016).  The Supreme Court applied "one person, one vote" to invalidate a scheme for the apportionment of seats in the

Alabama legislature, *see Reynolds v. Sims*, 377 U.S. 533, 563 (1964) (applying "one person, one vote" to strike down method for counting votes and highlighting that weighting "the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable"), and to a system placing Electors for a new party on the ballot, *see Moore v. Ogilvie*, 394 U.S. 814, 819 (1969) (concluding "The idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government").

52.     Only one case involving the constitutionality of a WTA system in the context of presidential elections has reached the Supreme Court and, in that case, the Court summarily affirmed the lower court's decision without an opinion. *Williams v. Va. State Bd. of Elections*, 288 F. Supp. 622 (E.D. Va. 1968), *summarily aff'd without opinion,* 393 U.S. 320 (1969).  In *Williams*, the plaintiffs brought an Equal Protection Clause challenge to Virginia's WTA system for selecting Electors before a three-judge panel.  The panel acknowledged "discrimination against the minority voters" because "once the electoral slate is chosen, it speaks only for the element with the largest number of votes." *Id.* at 627.  It nonetheless dismissed the complaint, ruling that "in a democratic society the majority must rule, unless the discrimination is *invidious.*" *Id.* (emphasis added).  The panel found that "No such evil has been made manifest" and dismissed the complaint. *Id.*

53.     To the extent that there was once an invidiousness requirement to a Fourteenth Amendment claim involving violation of the "one person, one vote" principle, the Court's decision in *Bush v. Gore*, 531 U.S. 98 (2000) removed it.  There, the Supreme Court invalidated Florida's process for recounting votes in the 2000 presidential election for violating the "one person, one vote" principle.  Notably, there was no suggestion that any unequal treatment of

16

votes under Florida's process was invidious. *See Bush*, 531 U.S. at 105; *see also id.* at 104 ("When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter."); *id.* at 107 (holding that "'the idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government.'") (quoting *Moore*, 394 U.S. at 819 (alteration omitted)).

> **B.  The WTA Method of Determining Electors Violates the Right to Associate Protected by the First and Fourteenth Amendments to the United States Constitution.**

54.   The right to associate is protected under the First and Fourteenth Amendments. "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958).

55.   The Supreme Court has long held that "political belief and association constitute the core of those activities protected by the First Amendment." *Elrod v. Burns*, 427 U.S. 347, 356 (1976). The "right of individuals to associate for the advancement of political beliefs" and "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively" are "overlapping" rights that "rank among our most precious freedoms." *Rhodes*, 393 U.S. at 30.

56.   Texas's WTA selection of Electors deprives Plaintiffs of their First and Fourteenth Amendment associational rights based solely on Plaintiffs' political association and expression of political views at the ballot box.

57.    Texas's WTA selection of Electors discards Plaintiffs' votes for President, limiting Plaintiffs' ability to express their political preference.  When Plaintiffs express their political preference through a vote for the Democratic or third-party candidate, Texas's WTA selection of Electors ensures that Plaintiffs' voices are not heard and Plaintiffs' votes do not count toward the selection of Electors.  Plaintiffs each become an "unequal participant in the decisions of the body politic." *Whitford v. Gill*, 218 F. Supp. 3d 837, 883 (W.D. Wis. 2016).

58.    In 1986, the Supreme Court held that a state law restricting access to primary voting to those who were registered members of the party was unconstitutional because it limited "the Party's associational opportunities at the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community." *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 216 (1986).  The associational rights of Plaintiffs and other Democrats and third-party voters in Texas are similarly restricted due to Texas's WTA selection of Electors.  Plaintiffs' votes are discarded "at the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community." *Id.*

59.    The WTA system also limits Plaintiffs' associational rights because it dilutes the power of the Democratic and third-party voters in Texas.  As a result, candidates from major political parties rarely hold campaign events in Texas once they are selected by their parties in the primary.  This results in a reduced opportunity for all Texans to interface with and petition the candidates for major political parties in person, and "to express their ideas, hopes, and concerns to their government and their elected representatives" as is also protected by the Petition Clause of the First Amendment. *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011).

60.     The impact of Texas's WTA system is felt nationally as well as locally.  Indeed, "in the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest." *Anderson v. Celebrezze*, 460 U.S. 780, 794–95 (1983) (footnote call omitted).  "Moreover, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States" and burdens on associational rights may place "a significant state-imposed restriction on a nationwide electoral process." *Id.* at 795.

61.     Texas has "a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries." *Id.*  And any regulation of such elections may not contravene constitutional rights.  *See id.* at 788 (citing *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

62.     "When deciding whether a state election law violates First and Fourteenth Amendment associational rights," courts must "weigh the 'character and magnitude' of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)).

63.     Texas's WTA selection of Electors poses a severe burden on Plaintiffs' associational rights that is not outweighed by any legitimate state interest.

**C.    The WTA System Makes United States Elections More Vulnerable to Outside Influences.**

64.     As government reports have concluded, "Russian intelligence accessed elements of multiple state or local electoral boards.  Since early 2014, Russian intelligence has researched US electoral processes and related technology and equipment."  U.S. Office of the Dir. of Nat'l

19

Intelligence, Background to "Assessing Russian Activities and Intentions in Recent US Elections": The Analytic Process and Cyber Incident Attribution, at 3 (2017), https://www.dni.gov/files/documents/ICA_2017_01.pdf.   "Russia's effort to influence the 2016 US presidential election represented a significant escalation in directness, level of activity, and scope of effort compared to previous operations aimed at US elections." *Id.* at 5.  Efforts from the outside to influence the outcome of United States elections strike at the core of our democracy.

65.    The current WTA system makes our election system more vulnerable to outside attacks, as prevailing under that system usually depends on gaining a majority in a handful of battleground states.  As one commentator explained: "It is true that our decentralized, precinct-by-precinct system would make a coordinated national vote hack a massive undertaking.  But given that our elections usually come down to a few predictable states, swaying even a national election is not as hard a task as it once seemed.  Sowing chaos at the district or precinct level appears to be within hackers' current capabilities."  Suzanne Mello-Stark, *It's now clear US voting is hackable.  Here are 6 things we must do to prevent chaos*, Vox (June 16, 2017, 10:50 AM), https://www.vox.com/the-big-idea/2017/6/16/15816510/voting-security-hacks-russia-georgia-election.

66.    Under a more equitable and constitutional method of selecting Electors, the risk of an outside influence changing the outcome of a presidential election is greatly reduced.  The votes of citizens in each state become meaningful and the outcomes of elections do not boil down to the winner of a few easily predictable states.

## TEXAS'S METHOD OF SELECTING ELECTORS VIOLATES THE VOTING RIGHTS ACT, SECTION 2

**A.    Texas Has a History of Racial Discrimination in Voting.**

67.     Texas has a long and well-documented history of racial discrimination against minorities, including Hispanic and African-American citizens, in voting, registration, and participation in the democratic process. That history has repeatedly been recognized by federal courts. *See, e.g., League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 439 (2006) (noting that the District Court recognized "the long history of discrimination against Latinos and Blacks in Texas . . . and other courts have elaborated on this history with respect to electoral processes" (citation and quotation marks omitted)); *Veasey v. Abbott*, 830 F.3d 216, 257 (5th Cir. 2016), *cert. denied sub nom. Abbot v. Veasey*, 137 S. Ct. 612 (2017) (citing the District Court's collection of cases and finding that in "every redistricting cycle since 1970, Texas has been found to have violated the VRA with racially gerrymandered districts" (citation and quotation marks omitted)); *Vera v. Richards*, 861 F. Supp. 1304, 1317 (S.D. Tex. 1994 ("Texas has a long, well-documented history of discrimination that has touched upon the rights of African–Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process."), *aff'd sub nom. Bush v. Vera*, 517 U.S. 952 (1996).

68.     Until 2013, Texas was a "covered jurisdiction" under Section 5 of the Voting Rights Act, and thus met the formula set out under Section 4(b) of the Act for determining which states need more oversight. *Shelby Cty., Ala. v. Holder*, 133 S. Ct. 2612, 2620 (2013). Congress required "preclearance" for covered jurisdictions because they maintained literacy tests or other obstacles to voting and had low voter registration or turnout in the 1960s and early 1970s. *Id.* at 2628. Those factors, the Supreme Court explained, "are relevant to voting discrimination because of their long history as a tool for perpetrating the evil; a low voting rate is pertinent for the obvious reason that widespread disenfranchisement must inevitably affect the number of actual voters." *South Carolina v. Katzenbach*, 383 U.S. 301, 330 (1966).

21

69.     Texas's history of discrimination also includes the documented use of at-large voting to dilute or eliminate the strength of Hispanic and African-American votes within a geographic area.

70.     In 2009, a United States District Court found that the City of Irving's use of an at-large system of electing its eight City Council members violated Section 2 of the Voting Rights Act and resulted in "structural dilution" for Hispanic voters that is more than "the mere loss of an occasional election." *Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 732 (N.D. Tex. 2009) (quotation marks and citation omitted).  The court found that for the Hispanic voting bloc in the City of Irving, "submergence in a white multimember district impedes its ability to elect its chosen representatives." *Id.* (quotation marks and citation omitted).  The effect of the at-large process was that not one "of Irving's eight current City Council members are Hispanic, and over the last twenty years only one Hispanic candidate has succeeded in a bid for Irving's City Council." *Id.* at 711.

71.     Texas's WTA system is in line with this history of discrimination and works in the same way as the at-large voting district discussed in *Benavidez*.  Both systems dilute the power of the Hispanic and African-American voting bloc by expanding the electorate to include more white voters.  Both systems deny African American and Hispanic voters equal access to the electoral and political process, in violation of Section 2 of the Voting Rights Act.

72.     Under Texas's WTA system, each party selects a set of electors for all 38 Electoral College votes, and the " set of elector candidates that is elected is the one that corresponds to the candidates for president and vice-president receiving the most votes." Tex. Elec. Code § 192.005.  This means that the presidential candidate that receives the most votes will win all 38 of Texas's Electoral College votes.

73.     President Barack Obama, for example, won over 41% of Texas's vote for the President in 2012, but received zero of Texas's 38 Electoral College votes.

74.     As a result of the WTA system of selecting Electors, Hispanic and African-American voters in Texas have not had a single Elector for their preferred candidate for the last 40 years, despite the fact that they make up over 40% of the CVAP in the state.  By contrast, the votes of the white majority have been magnified, because Republican candidates have received 100% of the state's electoral votes in that same time period.

75.     Less discriminatory means of selecting Electors are readily available.  As an example, Texas could select their Electoral College votes proportionally, giving each party a proportional number of the state's 38 Presidential Electors based on the percentage of votes their candidate received in the statewide election.  This is certainly a viable option for Texas, as it already allows its political parties to select delegates in a presidential *primary* campaign using a proportional method.  *See* Tex. Elec. Code § 191.007.

76.     Under a proportional system, Hispanic and African Americans are sufficiently numerous, compact, and cohesive to win multiple Electors for their preferred candidate for each election.

**B.     Texas's WTA System Meets Each of the Requirements to Establish a Violation of Section 2 of the Voting Rights Act.**

77.     Texas's use of the WTA system meets each of the elements necessary to establish a violation of Section 2 of the Voting Rights Act: (1) the Hispanic and African-American populations in Texas are "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the Hispanic and African-American populations in Texas are "politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to

23

defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986) (internal citation omitted).

> ### Gingles Factor #1: Texas has a sufficiently large and compact minority population.

78.     Texas has a sufficiently large and compact population of Hispanic voters and African-American voters for each voting bloc to win at least one preferred Presidential Elector in a proportional system of selecting Electoral College votes, or in other systems that do not result in the dilution of minority votes.

79.     According to 2016 Census estimates, 39.1% of the population in Texas is Hispanic and 12.6% of the population is African American.

80.     According to the American Community Survey ("ACS") estimates for 2011through 2015, the CVAP in Texas is 27.8% Hispanic and 12.9% African American.

81.     According to the 2010 Federal Census, the Hispanic population of Texas was 9,460,921 persons.  The Hispanic population of Texas was virtually the same as the total population of North Carolina (9,535,483) which was the 10th largest state in the Union.  North Carolina casts 15 electoral votes.  Stated otherwise, in 2010, the Hispanic population of Texas, standing alone, was larger than the total population of 40 states.

82.     According to the 2010 Federal Census the African-American population of Texas was 2,979,598 persons.  The African-American population of Texas was larger than the total population of Kansas (2,853,118) which was the 33rd largest State in the Union.  Kansas cast 6 electoral votes.  Stated otherwise, in 2010, the African-American population of Texas, standing alone, was larger than the total population of 17 states.

83.     According to the same ACS estimates for 2011through 2015, Hispanic voters make up a majority of the CVAP of the following Texas counties:  Atascosa, Bee, Bexar,

Brooks, Cameron, Crockett, Culberson, Deaf Smith, Dimmit, Duval, El Paso, Frio, Hidalgo, Hudspeth, Jim Hogg, Jim Wells, Kenedy, Kinney, Kleberg, La Salle, Maverick, Nueces, Pecos, Presidio, Reagan, Reeves, San Patricio, Starr, Sutton, Terrell, Uvalde, Val Verde, Webb, Willacy, Zapata, and Zavala counties.

84.      According to 2016 ACS estimates, the 15th, 16th, 20th, 23rd, 27th, 28th, 29th, 33rd, 34th, and 35th Congressional Districts in Texas are majority Hispanic.

> ### *Gingles Factor #2: Texas's Hispanic and African-American populations are politically cohesive minority voting blocs.*

85.      Voting in Texas is highly racially polarized and both Hispanic and African-American voters in the state are politically cohesive.

86.      Exit polls taken during the 2008 and 2016 Presidential elections showed that African-American voters in Texas voted for the Democratic candidate at rates of 98% and 84%, respectively, and Hispanic voters in Texas voted for the Democratic candidate at rates of 63% and 61%, respectively.  Nationwide exit polling for 2012 showed that 93% of African-American voters, and 73% of Hispanic voters, supported Barack Obama.

87.      Numerous courts, including the Supreme Court of the United States, have recognized that voting in Texas is racially polarized, and that the white, African American, and Hispanic populations vote as cohesive blocs.  *See, e.g.*, *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 427 (2006) (recognizing racially polarized voting in the entire state of Texas); *Veasey v. Abbott*, 830 F.3d 216, 258 (5th Cir. 2016) (noting the District Court's finding that "Texas has conceded that racially polarized voting exists in 252 of its 254 counties"), *cert. denied,* 137 S. Ct. 612 (2017); *Perez v. Abbott*, 253 F. Supp. 3d 864, 946 (W.D. Tex. 2017) ("It is undisputed in this case that voting in Texas is strongly racially polarized, and this polarization was reflected in the fact that 93 of the 101 Republican members of the House in 2011 were

Anglo, while only 8 of the 49 Democrat members were Anglo."); *Fabela v. City of Farmers Branch, Tex.*, No. 3:10-CV-1425-D, 2012 WL 3135545, at *11 (N.D. Tex. Aug. 2, 2012) ("The court finds that plaintiffs have proved racial bloc voting through statistical evidence from four elections and testimony by witnesses regarding their voting, thus satisfying the second and third prongs of *Gingles*."); *Benavidez v. City of Irving, Tex.*, 638 F. Supp. 2d 709, 731 (N.D. Tex. 2009) (concluding "that racially polarized voting is clear in Irving").

> ### Gingles Factor #3: Texas's white population votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate.

88.     As a result of the size of the white population and its political cohesiveness, white voters in Texas usually vote sufficiently as a bloc to enable them to defeat the Hispanic and African-American preferred candidate, including their preferred candidate for President.

89.     According to ACS estimates for 2011 through 2015, the CVAP in Texas is 54% white.

90.     Exit polls for the 2008 and 2016 Presidential election showed that white voters in Texas supported the Republican candidate at rates of 73% and 69%, respectively.

91.     As a specific example, Barack Obama received over 98% of African-American votes in Texas in 2008 and 63% of the Hispanic vote but was still unable to win a single Elector for the state.

92.     As stated above, despite the fact that 27.8% of the CVAP in Texas is Hispanic and 12.9% is African American, there have not been any Electors for the Hispanic and/or African American preferred-candidate since 1976 when President Jimmy Carter won every southern state except for Virginia and Oklahoma.

93.     Courts have repeatedly recognized that white voters in Texas vote sufficiently as a bloc to enable them to defeat the Hispanic and/or African-American preferred candidate.  *See,*

*e.g.*, *Perry*, 548 U.S. at 427 ("For all these reasons, appellants demonstrated sufficient minority cohesion and majority bloc voting to meet the second and third *Gingles* requirements."); *Campos v. City of Baytown*, 840 F.2d 1240, 1248–49 (5th Cir. 1988) ("Here, the evidence of racially polarized voting supports the district court's conclusion that white bloc voting usually defeats the minority candidate."); *Benavidez*, 638 F. Supp. 2d at 732 (noting that the expert witness demonstrated "that the white majority in Irving votes cohesively to defeat Hispanic preferred candidates").

### *Additional factors support a violation of Section 2 of the Voting Rights Act here*

94.     The "totality of the circumstances" supports a finding of racial discrimination in voting for the Presidency in violation of Section 2 of the Voting Rights Act.  52 U.S.C. § 10301(b).

95.     Numerous factors support the conclusion that both Hispanic and African-American voters in Texas have less opportunity than their white counterparts to participate in the political process and to elect representatives of their choice.

96.     Texas has a long, judicially-recognized history of racial discrimination against both Hispanics and African Americans in voting, registration, and participation in the democratic process.

97.     That history of racial discrimination has included the use of at-large voting districts, as well as instances where Hispanic and African-American citizens were barred from participating in choosing a candidate for general election.  *See, e.g.*, *Smith v. Allwright*, 321 U.S. 649, 664–65 (1944) (holding that restrictions on minorities voting in Texas primaries were unconstitutional); *Benavidez*, 638 F. Supp. 2d at 732.

98.     Texas's WTA system of selecting Electoral College votes works in the same way as an at-large district.  As a result, it enhances the opportunity for discrimination against Hispanic and African-American voters.

99.     The results of Texas's history of discrimination can be seen in the significant racial disparities in education, employment, health, housing, income, transportation, and incarceration in Texas.

100.    Numerous courts have recognized socioeconomic disparities between the Hispanic and African-American populations and the white population in Texas.  *See, e.g.*, *Veasey*, 830 F.3d at 258 ("The disparity in education, employment, and health outcomes between Anglos, African Americans, and Hispanics is manifest by the fact that the 29% of African Americans and 33% of Hispanics in Texas live below the poverty line compared to 12% of Anglos." (citations omitted)); *Campos*, 840 F.2d at 1249 (finding that "Blacks and Hispanics suffer the lingering socio-economic effects of past official discrimination"); *Benavidez*, 638 F. Supp. 2d at 727 ("In Irving, there are significant disparities in the educational levels of Hispanic and white residents, as reflected in data from the 2000 Census.").

101.    These socioeconomic disparities have limited the ability of Hispanic and African-American citizens in Texas to participate in the political process.  *See Perry*, 548 U.S. at 440 ("In addition, the political, social, and economic legacy of past discrimination for Latinos in Texas may well hinder their ability to participate effectively in the political process." (internal citations and quotation marks omitted)); *Veasey*, 830 F.3d at 259 (noting the district court found that "socioeconomic disparities have hindered the ability of African–Americans and Hispanics to effectively participate in the political process") (citation and quotations omitted).

102.    Elected officials in Texas have historically shown a lack of responsiveness to the needs of the Hispanic and African-American communities in the state.  *See Veasey*, 830 F.3d at 261 ("The district court also found that Texas's history of discrimination, coupled with SB 14's effect on minorities in Texas and the Legislature's response to ameliorative amendments, demonstrated a lack of responsiveness to minority needs by elected officials.").  The racial disparities in education, employment, health, housing, income, transportation, and incarceration serve as evidence of that lack of responsiveness.

103.    Modern political campaigns in Texas and nationwide, including presidential campaigns, are still at times characterized by overt and subtle racial appeals. As one of many examples, a political flyer used in 2008 attacked Joel Redmond, a white Democrat running for a Texas House seat, by associating him with minority politicians.  The flyer superimposed Redmond's head along with four other politicians—Barack Obama and three other minority politicians—over a picture of black birds.  The caption of the photo read, in dripping letters, "Birds of a Feather Flock Together" and "Bad Company Corrupts Good Character."

104.    The policy reasons underlying the use of the WTA system of selecting Electors in Texas are tenuous.

105.    Overall, the WTA system of selecting Electors perpetuates a history of discrimination against Hispanic and African-American voters in Texas and makes it all the more difficult to address the results of that discrimination.  It dilutes Hispanic and African-American votes for the President of the United States; it dampens incentives for Hispanic and African Americans in Texas to participate in the electoral process; it diminishes presidential candidates' incentives to campaign for the votes of Hispanic and African-American citizens of Texas; and it

impermissibly magnifies and multiplies the votes of the white majority.  It is therefore a violation of Section 2 of the Voting Rights Act.

### CAUSES OF ACTION

#### Count I – Fourteenth Amendment to the United States Constitution

106.    Plaintiffs reallege and incorporate all prior paragraphs of this Complaint.

107.    Texas's WTA system for selecting Electors results in the votes of citizens who voted for a losing candidate in the state not being counted in the final direct election for President.  Accordingly, Texas's WTA method of determining Electors violates the "one person, one vote" principle and the Fourteenth Amendment to the United States Constitution.

108.    Unless enjoined by order of this Court, Defendants will continue to violate the Fourteenth Amendment to the United States Constitution by implementing the WTA method of selecting Electors.

#### Count II – First and Fourteenth Amendments to the United States Constitution

109.    Plaintiffs reallege and incorporate all prior paragraphs of this Complaint.

110.    Texas's WTA system poses a severe burden on Plaintiffs' rights to associate and to effectively express their political preference through voting that is not outweighed by any legitimate state interest.  Accordingly, Texas's WTA method of determining Electors violates the First and Fourteenth Amendments to the United States Constitution.

111.    Unless enjoined by order of this Court, Defendants will continue to violate the First and Fourteenth Amendments to the United States Constitution by implementing the WTA method of selecting Electors.

#### Count III – Section 2 of the Voting Rights Act (52 U.S.C. § 10301)

112.    Plaintiffs reallege and incorporate all prior paragraphs of this Complaint.

113.    The WTA system of selecting Electors in Texas results in the denial or abridgment of the right of Hispanic and African-American citizens in Texas to vote on account of race or color in violation of Section 2 of the Voting Rights Act.  52 U.S.C. § 10301.

114.    Under the totality of the circumstances, the WTA system of selecting Electors results in less opportunity for Hispanic and African-American citizens in Texas than their white counterparts "to participate in the political process and to elect representatives of their choice." *Id.* at § 10301(b).

115.    The WTA system of selecting Electors has a direct causal connection to the denial or abridgment of the right of Hispanic and African-American citizens in Texas to vote on account of race or color.

116.    Unless enjoined by order of this Court, Defendants will continue to violate Section 2 by implementing the WTA method of selecting Electors.

## ATTORNEYS' FEES

117.    In accordance with 52 U.S.C. § 20510 and 42 U.S.C. § 1988, Plaintiffs are entitled to recover reasonable attorneys' fees, expenses, and costs.

## PRAYER FOR RELIEF

118.    WHEREFORE, Plaintiffs respectfully request that this Court:

a.    declare that Texas's current method of selecting Electors under Tex. Elec. Code § 192.005, and any other related section, is unlawful because it (1) treats Texas citizens who vote for a losing candidate in an arbitrary and disparate manner in violation of the Fourteenth Amendment of the United States Constitution; (2) burdens these citizens' rights to associate and to express their political preference effectively through voting in violation of the First and Fourteenth Amendments to the United

States Constitution; and (3) dilutes the voting strength of Hispanic and African-American voters in Texas in violation of Section 2 of the Voting Rights Act;

b.  declare that Plaintiffs' rights will be irreparably harmed without injunctive or declaratory relief from this Court;

c.  enjoin Defendants from selecting Electors under the challenged WTA system, or any other system that fails to treat each Texas citizen's vote for the President in an equal manner, including selection by Congressional District vote;

d.  set reasonable deadlines for state authorities to propose and then implement a method of selecting Electors that treats each Texas citizen's vote for the President in an equal manner, making clear that such a system *cannot* include selection by Congressional District vote;

e.  if state authorities fail to propose or implement a valid method of selecting Electors by the Court's deadlines, order a proportional method of distributing Electors, selecting a proportional number of Electors to each party, based on the number of votes each party's candidate receives statewide;

f.  adjudge all costs against Defendants, including reasonable attorneys' fees and costs;

g.  retain jurisdiction to render any and all further orders that this Court may deem necessary in order to ensure compliance; and

h.  grant any and all further relief to which Plaintiffs may show themselves to be entitled.

DATED: February 21, 2018

Respectfully submitted,

s/ Luis Roberto Vera, Jr.
Luis Roberto Vera, Jr.
Texas Bar No. 20546740
LULAC NATIONAL GENERAL
COUNSEL
Attorney and Counselor at Law
1325 Riverview Towers
111 Soledad
San Antonio, Texas 78205-2260
Telephone: (210) 225-3300
Facsimile: (210) 225-2060
lrvlaw@sbcglobal.net

David Boies (*Pro Hac Vice* Pending)
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile: (213) 629-9022
DBoies@bsfllp.com

James P. Denvir, III (*Pro Hac Vice* Pending)
Amy J. Mauser (*Pro Hac Vice* Pending)
Karen L. Dunn (*Pro Hac Vice* Pending)
Lisa Barclay (*Pro Hac Vice* Pending)
Amy L. Neuhardt (*Pro Hac Vice* Pending)
Hamish P.M. Hume (*Pro Hac Vice* Pending)
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
JDenvir@BSFLLP.com
AMauser@BSFLLP.com
KDunn@BSFLLP.com
LBarclay@BSFLLP.com
ANeuhardt@BSFLLP.com
HHume@BSFLLP.com

María Amelia Calaf
Texas State Bar No. 24081915
Jack A. Simms, Jr.
Texas State Bar No. 24100378
Ryan A. Botkin
Texas State Bar No. 00793366
Katherine P. Chiarello
Texas State Bar No. 24006994
Karen S. Vladeck
Texas State Bar No. 24102899
Wittliff | Cutter | Austin, PLLC
1803 West Ave.
Austin, Texas 78701
Telephone: (512) 960-4730
Facsimile: (512) 960-4869
mac@wittliffcutter.com
jack@wittliffcutter.com
ryan@wittliffcutter.com
katherine@wittliffcutter.com
karen@wittliffcutter.com

Michael D. Hausfeld (*Pro Hac Vice* Pending)
Swathi Bojedla (*Pro Hac Vice* Pending)
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone: (202)540-7200
Facsimile: (202)540-7201
mhausfeld@hausfeld.com
sbojedla@hausfeld.com

Randall L. Allen (*Pro Hac Vice* Pending)
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309-3424
Telephone: (404) 881-7196
Facsimile: (404) 253-8473
Randall.Allen@alston.com

Scott A. Martin (*Pro Hac Vice* Pending)
Irving Scher (*Pro Hac Vice* Pending)
Jeanette Bayoumi (*Pro Hac Vice* Pending)
HAUSFELD LLP

Matt Herrington (*Pro Hac Vice* Pending)
Roger E. Warin (*Pro Hac Vice* Pending)
Joe R. Caldwell, Jr. (*Pro Hac Vice* Pending)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:  (202) 429-3000
Facsimile:  (202) 429-3902
mherrington@steptoe.com
rwarin@steptoe.com
jcaldwell@steptoe.com


Mark Guerrero
Texas State Bar No. 24032377
Mary Whittle
Texas State Bar No. 24033336
GUERRERO & WHITTLE PLLC
114 West 7th Street, Suite 1100
Austin, TX 78701
Telephone: (512) 605-2300
Facsimile:  (512) 222-5280
mark@gwjustice.com
mary@gwjustice.com

33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: (646)357-1100
Facsimile: (212)202-4322
smartin@hausfeld.com
ischer@hausfeld.com
jbayoumi@hausfeld.com


Jennifer D. Hackett (*Pro Hac Vice* Pending)
James R. Martin (*Pro Hac Vice* Pending)
Allison M. Vissichelli (*Pro Hac Vice* Pending)
ZELLE LLP
1775 Pennsylvania Avenue, N.W., Suite 375
Washington, D.C.  20009
Telephone:  (202) 899-4100
Facsimile:  (202) 899-4102
jhackett@zelle.com
jmartin@zelle.com
avissichelli@zelle.com


Samuel Issacharoff
Texas State Bar No. 00785352
40 Washington Square South
New York, NY 10012
Telephone: (212) 998-6580
si13@nyu.edu