UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, LEAGUE OF UNITED LATIN AMERICAN CITIZENS OF TEXAS, JOSEPH C. PARKER, Jr., HECTOR FLORES, SANFORD LEVINSON, YVONNE M. DAVIS, MARY RAMOS, GLORIA RAY, GUADALUPE TORRES, RAY VALARDE, and DORIS WILLIAMS, | § § § § § § § § § § § | No. 5:18-CV-175-DAE |
| Plaintiffs, | § § | |
| vs. | § § | |
| GREGORY WAYNE ABBOTT, in his official capacity as Governor of the State of Texas, and ROLANDO PABLOS, in his official capacity as Secretary of State of the State of Texas, | § § § § § § § | |
| Defendants. | § § | |

<u>ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (DKT. # 21)</u>

Before the Court is a Motion to Dismiss filed by Defendants Greg

Abbott—Governor of Texas—and Rolando Pablos—Secretary of State of Texas—

("Defendants"). (Dkt. # 21). On February 13, 2019, the Court held a hearing on

the motion. At the hearing, David Boies, Esq. and Luis R. Vera, Jr., Esq.

represented Plaintiffs and Matthew H. Frederick, Esq., Patrick K. Sweeten, Esq.,

and Todd L. Disher, Esq. represented Defendants.  The motion is fully briefed and ripe for review.  After careful consideration of the memoranda filed in support of and in opposition to the motion, as well as the arguments advanced at the hearing, the Court—for the reasons that follow—**GRANTS** Defendants' Motion to Dismiss.[1]  (Id.)

## BACKGROUND

In presidential elections, Article 2 of the United States Constitution prescribes that "Each State shall appoint, *in such Manner as the Legislature thereof may direct*, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress . . . ."  U.S. Const. art. II, § 1, cl. 2 (emphasis added).  This action challenges Texas' "winner-take-all" ("WTA") method for selecting Presidential Electors.  Texas, along with 47 other States and the District of Columbia, has adopted statutes under which its 38 Electoral College Electors for president are appointed on a WTA basis.  See Tex. Elec. Code § 192.005 ("The set of elector candidates that is elected is the one

---

[1] In so ruling, the Court reaches the same conclusion recently reached in sister courts in the District of Massachusetts and the Central District of California as to the one person, one vote and First Amendment challenges to the winner-take-all system for selecting Presidential Electors that were presented in those cases.  See Lyman et al. v. Baker et al., No. 1:18-CV-10327-PBS (D. Mass. Dec. 7, 2018) (Dkt. # 52); Rodriguez et al. v. Brown et al., No. 2:18-CV-1422 (C.D. Cal. Sept. 21, 2018) (Dkt. # 83).

that corresponds to the candidates for president and vice-president receiving the most votes.").

Under the WTA system, all of a state's Electors are chosen by the political party whose candidate received the most votes in the State's presidential election. For instance, in the 2016 election President Donald Trump received 52.2% of the Texas vote, and former Secretary of State Hillary Clinton received 43.2% of the vote. (Dkt. # 1 at 2.) Yet the Republican Party selected all 38 of Texas' Electors, and the Democratic Party selected none.

On February 21, 2018, Plaintiffs filed suit in this case, asserting three causes of action: (1) violation of the Fourteenth Amendment because by "discarding" the votes cast for the losing candidate, the WTA system "unconstitutionally magnifies the votes of a bare plurality of voters by translating those voters into an entire slate of presidential Electors" (Dkt. # 1 at 5); (2) violation of the First Amendment because the WTA system "burdens . . . the right of association and . . . the right to have a voice in presidential elections through casting a vote" (id. at 6); and (3) violation of Section 2 of the Voting Rights Act ("VRA") because the WTA system works in the same way as at-large voting districts in allowing "white voters to . . . defeat all Electors slated for Hispanic and African-American preferred candidates" (id.).

Defendants filed their motion to dismiss on April 9, 2018. (Dkt. # 21.) Plaintiffs filed a response in opposition on May 7, 2018. Defendants filed a reply in support of their motion on May 21, 2018. A hearing was held on Defendants' motion on February 13, 2019.

LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." Review is limited to the contents of the complaint and matters properly subject to judicial notice. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). In analyzing a motion to dismiss for failure to state a claim, "[t]he court accept[s] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" In re Katrina Canal Beaches Litig., 495 F.3d 191, 205 (5th Cir. 2007) (quoting Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit, 369 F.3d 464, 467 (5th Cir. 2004)).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

<u>DISCUSSION</u>

Article II, Section 1, Clause 2 of the United States Constitution vests plenary power in the state legislatures to determine and implement the manner by which a state chooses its Electoral College Electors. <u>McPherson v. Blacker</u>, 146 U.S. 1, 35 (1892). Thus, "[t]he individual citizen has no federal constitutional right to vote" for Presidential Electors, and the State legislature "may, if it so chooses, select the Electors itself." <u>Bush v. Gore</u>, 531 U.S. 98, 104 (2000). However, in spite of this plenary power in the State legislature, Article 2, Section 1 does not "give[] the States power to impose burdens on the right to vote, where such burdens are expressly prohibited in other constitutional provisions."[2] <u>Williams v. Rhodes</u>, 393 U.S. 23, 29 (1968). Once "the state legislature vests the right to vote for President in its people, the right to vote . . . is fundamental . . . ." <u>Bush</u>, 531 U.S. at 104.

_____

[2] In this respect, Plaintiffs' prudential arguments are entirely beside the point. That WTA systems may lead Presidential campaigns to focus on "battleground states" or facilitate outside interference in our elections (Dkt. # 1 at 3–4; Dkt # 27 at 8) are irrelevant to this Court's determination. Either a WTA system for choosing Presidential electors is permissible under the First and Fourteenth Amendments and the VRA, or it is not. If WTA systems are constitutional and not in violation of statute, their wisdom and necessity are to be left to the reasoned judgment of the legislatures of each of the Several States. And if WTA systems are unconstitutional or in violation of statute, it is impermissible, no matter how wise or providential.

Against this backdrop, Plaintiffs challenge the State of Texas' decision to have all of its State's Electors chosen by the political party whose candidate receives the greatest number of votes as being in violation of the First and Fourteenth Amendments, and Section 2 of the VRA. In response, Defendants argue their motion to dismiss should be granted on one or both of two bases: (1) Plaintiffs' claims are precluded by binding precedent; and even if not (2) they are entitled to dismissal on the merits of each of Plaintiffs' claims for failure to state a claim upon which relief can be granted.

I.    Settled Precedent and "One Person, One Vote" – Fourteenth Amendment Equal Protection

Defendants begin by pointing to several prior decisions of the Supreme Court and the Fifth Circuit that they argue preclude all of Plaintiffs' claims as a matter of settled law. McPherson v. Blacker upheld a district-based mechanism[3] for electing presidential Electors as against challenges that it violated Article 2, Section 1, Clause 2 of the United States Constitution as well as the Equal Protection Clause of the Fourteenth Amendment. 146 U.S. at 3, 24, 42. However, McPherson is not controlling. McPherson dealt with the question of the

---

[3] Under the Michigan system at issue in McPherson, each congressional district chose one elector, corresponding to the electors Michigan was entitled to through its congressional representatives for those districts, and each half of the state selected an "at large" elector, corresponding to the electors Michigan was entitled to through its two senators. Id. at 24.

constitutionality of a district-based system; it did not address the question of WTA, beyond pointing out as a matter of historical practice that many States up to that point had implemented such a system. See id. at 29–33.

Defendants rely on language from McPherson that "if [Electors] are elected in districts where each citizen has an equal right to vote, the same as any other citizen has, no discrimination is made." Id. at 40. However, this holding predates by more than seventy years the revolution in the Supreme Court's thinking on the issue of voter equality that occurred in the 1960s and early 1970s and the establishment of the "one person, one vote" principle. See, e.g., Gray v. Sanders, 372 U.S. 368, 381 (1963) ("The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote."); Baker v. Carr, 369 U.S. 186, 209–10 (1962) (finding malapportionment claims under the Fourteenth Amendment justiciable).

The principle that where each citizen has an equal right to vote, no discrimination is made has undoubtedly survived. But what is required before it can be said that a citizen's right to vote is in fact equal has undoubtedly evolved from the time McPherson was handed down. See, e.g., Reynolds v. Sims, 377 U.S. 533, 562–64 (1964) (requiring state legislative districts be roughly proportional); Wesberry v. Sanders, 376 U.S. 1, 7–9 (1964) (requiring the same of federal

Congressional districts).  The entire question posed by this case is whether the

Texas WTA system renders the votes of some of its citizens unequal to the votes of

others of its citizens.  Thus, that the Supreme Court found a different system,

against a different doctrinal backdrop, preserved and respected the equal right to

vote does not dictate that the presently challenged system also does so.

The other cases urged by Defendants—Hitson v. Baggett, 446 F. Supp.

674 (M.D. Ala. 1978), summarily aff'd, 580 F.2d 1051 (5th Cir. 1978) and

Williams v. Va. State Bd. of Elections, 288 F. Supp. 622, 626 (E.D. Va. 1968),

summarily aff'd, 393 U.S. 320 (1969)—however, do control the outcome of this

case, at least in part.  Unlike McPherson, Hitson directly addressed a statewide

WTA system for selecting Presidential Electors, essentially analogous to the

present Texas system.  Hitson, 446 F. Supp. at 675.  In relevant part, the Plaintiffs

in Hitson contended that Alabama's state-wide WTA electoral scheme

discriminated against minority voters because "if Alabama's presidential Electors

were selected on a district basis, minority voters . . . could control the selection of

at least one or more of the state's Electors."  Id. at 676.  Yet as the Hitson Court

concluded, "that Alabama has not chosen to [structure its electoral scheme so that

minority voters had the power to control the selection of at least one presidential

elector] does not violate plaintiffs' rights" because "[n]o minority group has a right

under the Constitution to insist that state electoral systems be designed, where

possible, to give its members electoral control over the selection of persons for particular political offices." Id. (citing cases).

Plaintiffs argue Hitson is distinguishable because in Hitson there was "no contention that Alabama's electoral scheme for the selection of presidential Electors" operates "to minimize or cancel out the voting strength of [minority voters]." Id. (citing cases). Plaintiffs here assert that in contrast they have alleged such facts. (See Dkt. # 27 at 26 n.9.) Plaintiffs are correct that they have alleged facts indicating their votes are being minimized or cancelled out. (See, e.g., Dkt. # 1 at 2–3, 13–14.) But the premise underlying that assertion is that their votes are being minimized or cancelled, or otherwise not treated equally, because they "have not had a single elector slated for their preferred candidate in the last four decades" and are unable "to have Electors for their preferred candidate in *each* presidential election." (Dkt. # 1 at 6, 7.) These allegations fail to state an Equal Protection claim because, as stated in Hitson and affirmed by the Fifth Circuit, "[n]o minority group has a right under the Constitution to insist that state electoral systems be designed, where possible, to give its members electoral control over the selection of persons for particular political offices."[4] 446 F. Supp. at 676. That Texas'

---

[4] Plaintiffs' proposed remedy of proportional selection of electors is also problematic. City of Mobile v. Bolden, 446 U.S. 55, 79 (1980), superseded by statute on other grounds as stated by Thornburg v. Gingles, 478 U.S. 30 (1986)

chosen structure for selecting Electors does not give minority voters the power to

control the selection of any presidential Electors does not violate Plaintiffs' right to

Equal Protection.  Id.

   And even if <u>Hitson</u> were distinguishable for the reasons Plaintiffs

assert, the decision in <u>Williams</u> operates to the same effect.  In <u>Williams</u>, a

three-judge district court panel rejected a challenge to Virginia's WTA system for

choosing Electors.[5]  288 F. Supp. at 629.  As relevant to this case, the plaintiffs in

<u>Williams</u>—like the Plaintiffs here—argued the WTA system violated the "one

person, one vote" principle of the Fourteenth Amendment's Equal Protection

Clause.  <u>Id.</u> at 624.  As do the instant Plaintiffs, the <u>Williams</u> plaintiffs relied

principally on <u>Gray v. Sanders</u>, the case first announcing the principal.  288 F.

Supp. at 626.  The Court in <u>Williams</u> rejected the plaintiffs' contentions, finding

"in our judgement the [WTA method] does not come within the brand of these

decisions."  <u>Id.</u> (referring to <u>Gray v. Sanders</u>; <u>Reynolds v. Sims</u>; and <u>Wesberry v.</u>

---

("[T]he [Supreme] Court has sternly set its face against the claim, however
phrased, that the Constitution somehow guarantees proportional representation.").

[5] The panel's decision was summarily affirmed by the Supreme Court.  393 U.S.
320 (1969).

<u>Sanders</u>[6]).  Further, there was "nothing in the [WTA] rule offensive to the

Constitution."  <u>Id.</u> at 627.

After discussing the policy arguments against a WTA system, the

<u>Williams</u> Court further explained:

> Notwithstanding, it is difficult to equate the deprivations imposed by the [WTA] rule with the denial of privileges outlawed by the one-person, one-vote doctrine or banned by Constitutional mandates of protection.  In the selection of Electors the rule does not in any way denigrate the power of one citizen's ballot and heighten the influence of another's vote.  Admittedly, once the electoral slate is chosen, it speaks only for the element with the largest number of votes.  This in a sense is discrimination against the minority voters, but in a democratic society the majority must rule, unless the discrimination is invidious.  No such evil has been made manifest here.  Every citizen is offered equal suffrage and no deprivation of the franchise is suffered by anyone.

288 F. Supp. at 627.

Although summary affirmances by the Supreme Court should not be

read too broadly and do not necessarily endorse the reasoning of the lower court,

"[t]hey do prevent lower courts from coming to opposite conclusions on the

precise issues presented and necessarily decided by those actions."  <u>Mandel v.

Bradley</u>, 432 U.S. 173, 176 (1977).

---

[6] <u>Wesberry</u> also expressly stated that the one person, one vote rule is "followed automatically, of course, when [Congressional] Representatives are chosen as a group on a statewide basis."  376 U.S. at 7–8.

Plaintiffs first argue that <u>Williams</u> is not controlling because in <u>Williams</u> "voters cast their vote for Electors as candidates listed on the ballot[,]" whereas under the Texas system voters cast their vote directly for the presidential candidate. (<u>See</u> Dkt. # 27 at 27; <u>see also</u> Tex. Elec. Code § 192.034(b).) But as Defendants point out, under the Virginia system at issue in <u>Williams</u>—and just like the current Texas system—voters voted for one or the other political party, for that party's nominees for President and Vice-President, which constituted a block vote for all the Electors slated by that party. (Dkt. # 29 at 3; <u>see also</u> Dkt. # 27-1, Ex. A.) No vote could be cast for Electors individually, nor could any votes be cast separately from the other Electors. (<u>Id.</u>) Voters in Virginia voted for a collective full slate of Electors, just as they do now in Texas through voting expressly for a Presidential candidate. (<u>Id.</u>) Thus the mere naming of the Electors does not present a meaningful factual distinction between <u>Williams</u> and the instant case.

Plaintiffs also argue that <u>Williams</u> does not "address Plaintiffs' primary constitutional claim: that a state may not discard votes for the president through the WTA method of allocating Electors in the same manner that, in <u>Gray</u>, votes were discarded at an intermediate step in a two-step election." (Dkt. # 27 at 27.) But the court in <u>Williams</u> specifically confronted a <u>Gray</u> based argument and concluded Virginia's WTA system—functionally identical to Texas'—"does not come within the brand of [that] decision[]." 288 F, Supp. at 626.

Next, Plaintiffs argue <u>White v. Regester</u>'s striking down of a Texas county's use of multi-member at-large elections "fundamentally shifted the legal landscape."  (Dkt. # 27 at 28 (citing 412 U.S 755, 768 (1973).)  In <u>White</u>, the Supreme Court found two specific multimember districts were unconstitutional as an intentional attempt to "invidiously . . . cancel out or minimize the voting strength of racial groups" in light of Texas' history of discrimination against African–American and Mexican–American citizens.  412 U.S. at 765–70. Importantly, the <u>White</u> court carefully limited its holding, emphasizing that "multimember districts are not per se unconstitutional."  <u>Id.</u> at 765.  Even if the Court were to agree with Plaintiffs' analogy of WTA as creating one large, state-wide multimember district, <u>White</u> does not mandate the invalidation of all multimember districts.  Instead, White recognizes "claims that multimember districts are being used invidiously to cancel out or minimize the voting strength of racial groups."  <u>Id.</u>  <u>White</u>'s holding is thus consistent with <u>Williams</u>' conclusion that WTA elector selection is permissible because "in a democratic society the majority must rule, unless the discrimination is invidious."  288 F. Supp. at 627.

While the Court is cognizant of the troublesome history of electoral discrimination in the state of Texas, as described in <u>White</u> and elsewhere, Plaintiffs allege no facts suggesting the WTA system was specifically adopted to cancel out the voting strength of any particular group.  Long before the specter of invidious

electoral discrimination reared its head, WTA was the dominant form of choosing Electors for President.  See McPherson, 146 U.S. at 32 ("After 1832 Electors were chosen by [WTA] in all the states except South Carolina . . . .").  Texas itself has used WTA since 1848, its first presidential election after joining the Union.  See Act approved March 15, 2848, 2d Leg., ch. 94, § 2, reprinted in 3 H.P.N. Gammel, The Laws of the Texas, 1822 –1897, at 104–06; see also McPherson, 146 U.S. at 32.  And WTA remains the dominant form of choosing Electors, utilized in 48 States and the District of Columbia, including many States that lack the history of discrimination that plagues Texas.

Moreover, the WTA system has a readily discernable non-invidious purpose.  WTA protects a state against the use of WTA by other States.  When a State slates its Electors in a way that permits divided representation, if other States use a WTA method, their consolidated block of Electors carries more weight in the electoral college.[7]  See Williams, 288 F. Supp. at 626 (pointing out that this justification was relied on by Thomas Jefferson in advising Virginia to implement a WTA system, despite his own preference for a district-based system).

Finally, Plaintiffs argue Bush v. Gore, 531 U.S. 98 (2000), dispensed with the need for a showing of invidiousness that was applied by the Williams

---

[7] In this way, Texas' WTA system is also not in violation of the Fourteenth Amendment under Bush as arbitrary.  See 531 U.S. at 104–05.

court.  (Dkt. # 27 at 29).  The Supreme Court in <u>Bush</u> held that "[h]aving once

granted the right to vote on equal terms, the State may not, by later arbitrary and

disparate treatment, value one person's vote over that of another."  531 U.S. at

104–05.  Plaintiffs thus suggest that before <u>Bush</u>, a "one person, one vote" claim

required proof of invidiousness, but that after <u>Bush</u>, a showing of arbitrary and

disparate treatment is sufficient.  (Dkt. # 27 at 29–30.)

        However, <u>Bush</u>'s precedential value is unclear.  Its primary opinion is

expressly "limited to the present circumstances."  531 U.S. at 109.  It is therefore

unlikely the Supreme Court intended to overturn or undermine <u>Williams</u>,

particularly so where <u>Bush</u> does not discuss <u>Williams</u> or address in any way the

issues it decided.  The Supreme Court "does not normally overturn, or . . .

dramatically limit, earlier authority sub silentio."  <u>Shalala v. Ill. Council on Long

Term Care, Inc.</u>, 529 U.S. 1, 18 (2000).

        Some pre-<u>Bush</u> cases do appear to indicate that an Equal Protection

claim requires proving invidiousness.  <u>See, e.g.</u>, <u>Dusch v. Davis</u>, 387 U.S. 112, 116

(1967) ("[T]he constitutional test under the Equal Protection Clause is whether

there is an 'invidious' discrimination.")  But some post-<u>Bush</u> decisions do as well.

<u>See, e.g.</u>, <u>Harris v. Ariz. Indep. Redistricting Comm'n</u>, 136 S. Ct. 1301, 1307

(2017) ("[M]inor deviations from mathematical equality do not, by themselves,

make out a prima facia case of invidious discrimination under the Fourteenth Amendment . . . .") (citations and quotation marks omitted).

Moreover, Plaintiffs' argument that <u>Bush</u> changed the legal landscape ignores that the Supreme Court had recognized prior to <u>Williams</u> that a "one person, one vote" claim could be based on either invidious discrimination or arbitrary and disparate treatment.  <u>See</u> <u>Roman v. Sincock</u>, 377 U.S. 695, 710 (1964) (holding that "faithful adherence to a plan of population-based representation . . . free from any taint of *arbitrariness or discrimination*" satisfies the Equal Protection Clause) (emphasis added).  The disjunctive language in <u>Roman</u> stipulating that a "one person, one vote" violation can be shown in the absence of invidious discrimination is consistent with the Supreme Court's holding in <u>Bush</u> and finds support elsewhere in Equal Protection jurisprudence.  <u>See, e.g.,</u> <u>Hunter v. Hamilton Cty. Bd. of Elections</u>, 635 F.3d 219, 234 & n.13 (6th Cir. 2011) (applying an "arbitrary and disparate" standard and noting that "a showing of intentional discrimination has not been required" in previous Supreme Court decisions); <u>cf.</u> <u>Clements v. Fashing</u>, 457 U.S. 957, 967 (1982) ("Classification is the essence of all legislation, and only those classifications which are invidious, arbitrary, or irrational offend the Equal Protection Clause of the Constitution.").

The Supreme Court has also "admonished the lower federal courts to follow its directly applicable precedent, even if that precedent appears weakened

by pronouncements in its subsequent decisions, and to leave to the Court 'the prerogative of overruling its own decisions.'" Randell v. Johnson, 227 F.3d 300, 301 (5th Cir. 2000) (per curiam) (quoting Agostini v. Felton, 521 U.S. 203, 237 (1997)).

For these reasons, the Court finds no material factual distinctions or intervening doctrinal shifts that militate the binding precedential nature of Hitson or Williams. These decisions therefore require that Plaintiff's Equal Protection claim be **DISMISSED**.[8]

Nevertheless, Hitson and Williams only addressed challenges to WTA systems for choosing presidential Electors under the Fourteenth Amendment's Equal Protection guarantee and the "one person, one vote" principle. See Williams, 288 F. Supp. at 626; Hitson, 446 F. Supp at 676. Summary affirmances only "prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions." Mandel, 432 U.S. at 176 (1977). As Hitson and Williams did not address challenges brought under the First Amendment's guarantee of freedom of association or Section 2 of the VRA,

---

[8] Even if this Court were not bound by the decisions in Hitson and Williams, Plaintiffs' Equal Protection claim would still fail for reasons substantially identical to those expressed in those cases.

those cases do not dictate this Court's conclusion on those issues.  Thus, the Court must now turn to the substance of those claims.

II.     Freedom of Association – First and Fourteenth Amendments

"It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces [the First Amendment]."  NAACP v. Alabama, 357 U.S. 449, 460 (1958).  But although the "rights of voters are fundamental, not all restrictions imposed by the States . . . impose constitutionally-suspect burdens on voter's rights to associate or to choose among candidates."  Anderson v. Celebrezze, 460 U.S. 780, 788 (1983).  To resolve challenges to specific provisions of a State's election laws, a court:

> must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.  It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule.  In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.  Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.  The results of this evaluation will not be automatic; as [the Supreme Court has] recognized, there is no "substitute for the hard judgments that must be made."

Id. at 789 (quoting Storer v. Brown, 415 U.S. 724, 730 (1974)) (internal citations omitted).

Plaintiffs argue their association rights are burdened because Texas' WTA scheme: (1) discards or dilutes the votes of minority party members and magnifies the impact of majority party votes; (2) disincentivizes voters from joining or participating in minority parties and discourages voting by minority party members; and (3) eliminates all practical opportunities for non-dominant party voters in Texas to effectively voice their preference for President. (Dkt. # 1 at 3–4, 7, 13–14, 18; Dkt. # 27 at 31.)

However, the Court concludes that these assertions do not state a cognizable burden on the Plaintiffs' First and Fourteenth Amendment associational rights. "[T]he function of the election process is 'to winnow out and finally reject all but the chosen candidates.'"[9] Burdick v. Takushi, 504 U.S. 428, 438 (1992) (quoting Storer, 415 U.S. at 735). "Attributing to elections a more generalized expressive function would undermine the ability of States to operate elections fairly and efficiently." Id.

The instant case, and the alleged associational harms, are distinguishable from those cases relied on by Plaintiffs. This case does not concern

_____

[9] Although under the Electoral College system the vote can be conceptualized as one for individual electors, as even Plaintiffs recognize (see, e.g., Dkt. # 27 at 1, 14), the "preferred candidate" for whom citizens vote is not the electors, but the presidential nominee his or herself. The candidate "chosen" by the State of Texas is thus the Presidential candidate receiving the largest share of its citizens' votes.

an issue of ballot access.  See, e.g., Anderson, 460 U.S. at 782; Rhodes, 393 U.S. at 24–26.  The candidate Plaintiffs preferred to vote for—the Democratic candidate— was indisputably included on the ballot.  Nor does it concern a deprivation of the ability to cast a vote for the candidate of their choice, the "prime objective of most voters in associating themselves with a particular party" discussed in Kusper v. Pontike. 414 U.S. 51, 58 (1973).  Each individual plaintiff indicated he or she was able to and did vote for the Democratic candidate in every presidential election in which he or she voted.  (Dkt. # 1 at 8–10.)

This case also does not restrict a political party's "associational opportunities" in their party primary, the "crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community" discussed in Tashjian v. Republican Party of Connecticut. 479 U.S. 208, 883 (1986).  The "crucial juncture" described in Tashjian is the ballot box, and Plaintiffs translated their common principles into concerted action at this crucial juncture by all voting for former Secretary of State Hillary Clinton and other Democratic Presidential candidates.  Nor does it involve the Petition Clause that was at issue in Borough of Duryea v. Guarnieri, as "the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes."  564 U.S. 379, 387 (2011).  The vindication of Plaintiffs' Petition Clause rights is

demonstrated by the existence and consideration of this very lawsuit.  And

Reynolds v. Sims was decided under the Equal Protection Clause, not the First

Amendment's guarantee of freedom of association.  377 U.S. at 566.

In short, Plaintiffs have provided no support in prevailing case law or

doctrine that the First Amendment's associational guarantees cognize the harms

they allege.

Instead, Plaintiffs' theories of associational harms most directly echo

those expressed in Justice Kagan's concurrence in Gill v. Whitford, 138 S. Ct. 1916

(2018).  Although the case was decided on standing grounds related to a "one

person, one vote" challenge to partisan gerrymandering, Justice Kagan wrote

separately to discuss the "significant First Amendment concerns . . . when a State

purposely subjects a group of voters or their party to disfavored treatment."  Id. at

1938.  These "associational harm[s] can "ravage[] the party [a voter] works to

support" by "depriv[ing party members] of their natural political strength[,]"

causing them to "face difficulties fundraising, registering voters, attracting

volunteers, generating support from independents, and recruiting candidates to run

for office (not to mention eventually accomplishing their policy objectives)."  Id.

And "placing a state party at an enduring electoral disadvantage . . . weakens its

capacity to perform all its functions."  Id.

But these harms arise by virtue of "subjecting a group of voters or their party to disfavored treatment by reason of their view," infringing "'the ability of citizens to band together in promoting among the electorate candidates who espouse their political views.'" Vieth v. Jubelirer, 541 U.S. 267, 314 (2004) (quoting Cal. Democratic Party v. Jones, 530 U.S. 567, 574 (2000). By contrast, the harms alleged by Plaintiffs do not occur "by reason of their views." Whatever disadvantage Plaintiffs suffer is a consequence only of there being more Republican voters than Democratic voters in Texas and Plaintiffs' resulting lack of electoral success. "The First Amendment right to associate and to advocate provides no guarantee that a speech will persuade or that advocacy will be effective." Smith v. Ark. State Highway Emps., Local 1315, 441 U.S. 463, 464–65 (1979). Instead, "the function of the election process" is not to vindicate every view expressed at the ballot box, but to "to winnow out and finally reject all but the chosen candidates." Burdick, 504 U.S. at 438 (quoting Storer, 415 U.S. at 735).

As Plaintiffs repeatedly state, "the basic reality of Texas' elections today" is that voters "cast a ballot for the president." (See, e.g., Dkt. # 27 at 1, 14.) It is beyond dispute that in determining who received more votes for President in Texas, Plaintiffs' individual votes were counted just the same as any other voter, and that they were permitted the opportunity to express their Presidential preference by means of that vote. Whatever disincentive to vote or participate in

minority parties arises from their preferred candidate having failed to receive more votes than her opponent.  But that one candidate will lose by virtue of receiving fewer votes, and that her supporters will be thereby dispirited and disincentivized, is an inescapable reality of democracy.  It does not state a cognizable First Amendment burden on free association.  Further, that Plaintiffs' votes failed to win them any Electors for their preferred candidate does not mean their opportunity to express their Presidential preference was ineffective because "no . . . group has a right under the Constitution to insist that state electoral systems be designed, where possible, to give its members electoral control over the selection of persons for particular political offices[,]" including presidential Electors.  Hitson, 446 F. Supp. at 676.

Finally, even were this Court to conclude Plaintiffs had adequately alleged First and Fourteenth Amendment associational harms, those harms are justified by Texas' interest in maximizing its electoral power by having its Presidential Electors vote in a unified bloc.  As previously stated, no less than Thomas Jefferson recognized the merit and necessity of this "protect[ion] . . . against the use of [WTA] by the other States" in recommending Virginia adopt WTA, despite his own personal preference for district-based selection of Electors.  Williams, 288 F. Supp. at 626.  As 47 other states and the District of Columbia also utilize WTA systems, the impetus—as recognized by Jefferson—for Texas' policy

under this interest is well established.  As such, a divided slate of Electors would greatly diminish Texas' influence in the Electoral College and its ability to elect the Presidential candidate chosen by the majority of its citizens.  Moreover, that nearly all States have implemented this policy, and have done so since 1832, see McPherson, 146 U.S. at 32, only further underscores the non-pretextual nature of the asserted interest.[10]

For these reasons, Plaintiffs' First and Fourteenth Amendment Freedom of Association cause of action must be **DISMISSED**.

III.    Section 2 of the VRA

Section 2 of the VRA prohibits any "standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color," 52 U.S.C. § 10301(a), or by virtue of membership in "a language minority group[,]" 52 U.S.C. § 10303(f)(2). A violation of Section 2:

> is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens . . . in that its members have less opportunity than

---

[10] The Court recognizes that if WTA systems were struck down nationwide, the validity of this interest would seem to vanish.  However, this Court is not in the position to award such a remedy.  This suit, as brought by Plaintiffs, only challenges the WTA system in Texas and does not request any nationwide injunction or any other remedy that would reach beyond the borders of Texas.

> other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301(b); <u>see also</u> <u>Gingles</u>, 478 U.S. at 48 ("Minority voters who contend [a violation of] § 2, must prove that the use of a multimember electoral structure operates to minimize or cancel out their ability to elect their preferred candidates.").

Plaintiffs argue Texas' WTA method for choosing Presidential Electors violates this statutory guarantee. Plaintiffs rely on the analytical framework established by the Supreme Court in <u>Thornburg v. Gingles</u> in scrutinizing North Carolina's "legislative decision to employ multimember, rather than single-member, districts in the contested jurisdictions . . . ." 478 U.S. at 47. Plaintiffs invoke <u>Gingles</u> by analogizing a WTA system of selecting Electors to that of an at-large, i.e. multimember, voting district, congruent to the whole of the State of Texas. (Dkt. # 1 at 6, 22.)

As a threshold matter, the Court firmly agrees with Plaintiffs that Section 2 the VRA applies to Presidential Elections. The language of Section 2 is intentionally broad and applies to "[e]very election in which registered Electors are permitted to vote . . . ." <u>Chisholm v. Romer</u>, 501 U.S. 380, 392 (1991). Section 2 is "largely . . . a restatement of the Fifteenth Amendment." <u>Id.</u> And the Fifteenth Amendment was "intended to [apply] in presidential elections." <u>Rhodes</u>, 393 U.S.

at 23.  However, the Court concludes that Plaintiffs have failed to state a claim under Section 2 of the VRA.

"Multimember districts and at-large election schemes . . . are not per se violative of minority voters' rights."  Gingles, 478 U.S. at 48.  Gingles requires that Plaintiffs challenging an at-large system must show: "(1) the group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) it is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate."  League of United Latin American Citizens, Council No. 4434 v. Clements, 999 F.2d 831, 849 (5th Cir. 1993) (citing Growe v. Emison, 507 U.S. 25, 39 (1993)).  Plaintiffs' allegations fail, at the very least, to satisfy the third prong of the Gingles test.[11]

According to Plaintiffs, in 2008 and 2016, 27% and 31% respectively of white voters in Texas voted for the Democratic candidate for President, undercutting the premise that whites vote in a uniform bloc.  (Dkt. # 1 at 26.)  And 37% and 39% respectively of Hispanic voters voted for the Republican candidate. (Id. at 25.)  Thus not only did a sizable number of white voters vote for the

---

[11] The Court also questions whether the Plaintiffs have satisfied the second prong, at least as it relates to Hispanics in Texas.  According to Plaintiffs, 37% and 39% of Hispanics did not vote for the Democratic Presidential candidate in 2008 and 2016 respectively.  (Dkt. # 1 at 25.)  In 2012, 27% did not.  (Id.)

candidate preferred by the asserted minority groups, but a sizable number of non-white voters did not.

Taking the relevant numbers advanced by Plaintiffs in their complaint, in 2008 and 2016, Hispanic voters who voted for the Republican candidate constituted roughly 16% of the voting electorate, nearly twice the margin by which the Democratic Candidate lost the 2016 presidential election in Texas. (See Dkt. # 1 at 2, 26.) If nearly 40% of Hispanic voters had not voted for the Republican candidate,[12] the combined strength of minority voters and the large number of white "crossover" voters would have been able to carry the Presidential election in Texas, challenging the assertion that whites vote as a legally significant bloc. See Gingles, 478 U.S. at 31 ("In general, a white bloc vote that normally will defeat the combined strength of minority support plus white "crossover" votes rises to the level of legally significant white bloc voting.")

The facts alleged by Plaintiffs, therefore, strongly implicate the conclusion that the relevant bloc frustrating Plaintiffs' election success is not whites but Republicans. As the Fifth Circuit has recognized, "[t]here is . . . a powerful argument supporting a rule that plaintiffs, to establish legally significant

---

[12] A roughly 16% swing in Hispanic voters from Republican to Democrat would have been enough to swing the 2016 Presidential election in Texas to the Democratic candidate.

racial bloc voting, must prove that their failure to elect representatives of their

choice cannot be characterized as a mere euphemism for political defeat at the

polls, or the result of partisan politics." Clements, 999 F.2d at 859 (citing

Whitcomb v. Chavis, 403 U.S. 124, 153 (1993)).  As the Fifth Circuit elaborated,

based on the Supreme Court's decision in Whitcomb:

> Absent evidence that minorities have been excluded from the political process, a lack of success at the polls is not sufficient to trigger judicial intervention.  Courts must undertake the additional inquiry into the reasons for, or causes of, these electoral losses in order to determine whether they were the product of partisan politics or racial vote dilution, political defeat or built-in bias.  It is only upon concluding that a minority group's failure to prevail at the polls, that is, their failure to attract the support of white voters, was the result or function of racial vote dilution or built-in bias, that a court may find that minority plaintiffs have suffered a denial or abridgement of the right . . . to vote on account of race or color. . . .

> [F]ailures of a minority group to elect representatives of its choice that are attributable to partisan politics provide no grounds for relief. Section 2 is a balm for racial minorities, not political ones—even though the two often coincide.  The Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if [minority] voters are likely to favor that party's candidates.  Rather, § 2 is implicated only where Democrats lose because they are black, not where blacks lose because they are Democrats.

Clements, 999 F.2d at 853–54 (quotations marks and internal citations omitted);

see also Johnson v. De Grandy, 512 U.S. 997, 1014 n.11 (1994) ("[T]he ultimate

right of § 2 is equality of opportunity, not a guarantee of electoral success for

minority-preferred candidates of whatever race.")

That a similar pattern also emerges under WTA systems in states where Democrats hold political majorities underscores that the animating issue here is partisan, not racial. If "the Democrats won" the election—as they did under an identical mechanism in majority democratic states—Plaintiffs "would have had no justifiable complaints about representation." <u>Whitcomb</u>, 403 U.S. at 152. Thus, while "[t]he voting power of [Plaintiffs] may have been 'cancelled out' . . . this seems a [mere] euphemism for political defeat at the polls." <u>Id.</u> at 153.

Moreover, satisfaction of <u>Gingles</u>' three "'preconditions,' is necessary, but not sufficient to establish liability under § 2." <u>Clements</u>, 999 F.2d at 849. (internal citations omitted). "Plaintiffs must also show that, under the 'totality of circumstances,' they do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters." <u>Id.</u> The same "cancelling out" of political strength Plaintiffs complain of was also inflicted on a sizable minority of white Texans and many mostly-white Republican minorities in majority Democratic states, by virtue of political affiliation, not race. The simple fact is that Plaintiffs in this case were not:

> any more underrepresented than . . . whites who also voted Democratic and lost, or any more discriminated against than other interest groups or voters . . . with allegiance to the Democratic Party, or, conversely, and less represented than Republican[s in areas] of Republican defeat[.] . . . The mere fact that one interest group or another concerned with the outcome of [the] election[] has found itself outvoted and without [Electors] of its own provides no basis for invoking constitutional

remedies where, as here, there is no indication that this segment of the population is being denied access to the political system.

Whitcomb, 403 U.S. at 154–55.  Plaintiffs' defeats were shared equally among all members of their political party and members of the opposing political party in other states.

Thus the inescapable conclusion is that Plaintiffs were unable to elect Electors for their candidate of their choice because there are fewer Democrats who voted in Texas, not because the system operates to cancel out the ability of racial minorities to elect their preferred candidate—roughly 40% of Hispanics were able to do so, and roughly 30% of whites were not.  (See Dkt. # 1 at 25, 26.)

Finally, "[b]ecause the very concept of vote dilution implies—and, indeed, necessitates—the existence of an 'undiluted' practice against which the fact of dilution may be measured, a § 2 plaintiff must also postulate a reasonable alternative voting practice to serve as the benchmark 'undiluted' voting practice." Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 480 (1997) (citing Holder v. Hall, 512 U.S. 874, 880 (1994)).  Plaintiffs fail to present one.

As stated by Plaintiffs, their "primary remedy is to allow the state to devise its own constitutional scheme for the selection of Electors."  (Dkt. # 27 at 36; see also Dkt. # 1 at 32.)  This vague, unspecified remedy fails to adequately define an undiluted voting practice for this Court to use as a benchmark to compare with the current practice of the State of Texas.  And Plaintiffs specifically disclaim

the readily apparent alternative of Congressional district-based selection as equally unrepresentative.  (Dkt. # 1 at 5, 32.)  Plaintiffs cannot shift the burden of presenting an undiluted benchmark onto Defendants in this way.

To the extent Plaintiffs specify any adequate alternate scheme, they propose that "if state authorities fail to propose or implement a valid method of selecting Electors . . . ," the Court should "order a proportional method of distributing Electors, selecting a proportional number of Electors to each party, based on the number of votes each party's candidate receives statewide."  (Dkt. # 1 at 32.)  But Section 2 of the VRA specifically disavows "a right to have members of a protected class elected in numbers equal to their proportion in the population."  52 U.S.C. § 10301(b).  If Section 2 does not entail a right of racial minorities to proportional representation, it certainly cannot entail such right of political minorities.

The "on account of race or color" requirement of Section 2 of the VRA was intended to "effectuate the Fifteenth Amendment's guarantee that no citizen's right to vote shall be denied or abridged . . . on account of race, color, or previous condition of servitude.'"  Voinovich v. Quilter, 507 U.S. 146, 152 (1993) (quoting U.S. Const. amend. XV).  If Section 2 permitted or required a remedy of proportional representation in the Electoral College for political parties it would not be "congruent or proportional" to the violation of the asserted constitutional

right, which is required of remedial legislation under the Reconstruction Amendments.  See City of Boerne v. Flores, 521 U.S. 507, 520 (1997); see also City of Mobile, 446 U.S. at 79, superseded by statute on other grounds as stated by Gingles, 478 U.S. at 71 ("[T]he [Supreme] Court has sternly set its face against the claim, however phrased, that the Constitution somehow guarantees proportional representation.").

Accordingly, Plaintiffs claim under Section 2 of the VRA must be **DISMISSED**.

<u>CONCLUSION</u>

For the reasons stated, the Court **GRANTS** Defendants' Motion to Dismiss.  (Dkt. # 21.)  Because the Court finds Plaintiffs' Fourteenth Amendment "one person, one vote" claim is precluded by binding precedent, that claim is **DISMISSED WITH PREJUDICE**.  Further, because the Court believes any amendment to Plaintiffs' First Amendment freedom of association and VRA Section 2 claims would be futile—for the reasons discussed in this order—those claims are also **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

**DATED**: San Antonio, Texas, February 25, 2019.

_____

David Alan Ezra
Senior United States District Judge